NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251232-U

NOS. 4-25-1232, 4-25-1233 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | No. 23JA282 |
| v.       (No. 4-25-1232) | ) | |
| Amelia G., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 23JA283 |
| *In re* N.J., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.       (No. 4-25-1233) | ) | Honorable |
| Amelia G., | ) | David A. Brown, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Steigmann and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court granted appellate counsel's motions to withdraw as counsel and affirmed the trial court's judgments, concluding no issues of arguable merit could be raised on appeal in the consolidated cases.

¶ 2     Respondent, Amelia G., filed notices of appeal from two judgments of the Peoria County circuit court, which respectively terminated her parental rights to her minor children, R.J. (born October 2023) (Peoria County case No. 23-JA-282), and N.J. (born December 2022) (Peoria County case No. 23-JA-283). The trial court ordered attorney Linda Groezinger to represent her in both appeals. This court docketed the appeals as appellate case Nos. 4-25-1232 (R.J.) and 4-25-

1233 (N.J.) and consolidated them for review on its own motion. Appellate counsel now moves to withdraw as counsel in both cases, asserting there exist no viable or meritorious grounds for appeal in either case. Amelia G. did not respond to the motion to withdraw. After reviewing the record, we grant appellate counsel's motion and affirm the court's judgment in both cases.

¶ 3                                  I. BACKGROUND

¶ 4                  A. Adjudication of Neglect and Permanency Reviews

¶ 5          In December 2023, the State filed one-count petitions for adjudication of neglect in the Peoria County circuit court on behalf of Amelia G.'s minor children, R.J. (No. 23-JA-282) and N.J. (No. 23-JA-283), whom Amelia G. shares with their father, Dorrell J. Dorrell J. is not a party to this appeal. Amelia G. also has two other minor children who are not the subject of these consolidated appeals, E.G. and A.G. The respective petitions alleged R.J. and N.J. were neglected minors in that their environment was injurious to their welfare. See 705 ILCS 405/2-3(1)(b) (West 2022). The petition involving R.J. alleged as follows:

> "A. Minor [R.J.] was born prematurely with a significant birth defect that affects the heart. Neither the mother Amelia [G.] nor the legal father Dorrell [J.] could be reached by Carle/Methodist Unity Point hospital to consent to surgery;
>
> B. As of December l8, 2023, the mother has not visited the minor [R.J.] in the neonatal intensive care unit since December 5, 2023;
>
> C. Since November 20, 2023, [the Department of Children and Family Services (DCFS)] has been attempting to contact the mother and Dorrell [J.], but to no avail;
>
> D. As of December l8, 2023, the minor's siblings, [N.J., E.G., and A.G.] cannot be located by DCFS;

E. The mother Amelia [G.] and the legal father to the minors [N.J. and R.J.], Dorrell [J.], have a history of alcohol and domestic violence as evident in that:

1. On December 11, 2023, the minors [E.G. and A.G.] called police. They had not been residing with their mother due to the constant alcohol and domestic violence issues. During a periodic welfare check on their mother, an intoxicated Dorrell [J.] punched a hole in the wall while arguing with the intoxicated mother. Both minors refused to return home.

2. On December 7, 2023, the mother and Dorrell [J.] argued about the minors [E.G. and A.G.] Dorrell [J.] attempted to strike the mother in the face. The mother was holding the minor [N.J.] at the time. The mother refused to go to a safe shelter or to press charges.

3. On September 24, 2023, the mother and Dorrell [J.] argued about the mother's drinking issues while both were intoxicated. The mother refused to obtain an order of protection. In the presence of the minors [E.G. and A.G.], the mother threatened to stab Dorrell [J.] if he returned to the residence.

4. During some arguments, Dorrell [J.] brandishes a gun at the mother and others in the residence.

F. The minor [E.G.] was expelled from [high school] for intending to sell 2.5 ounces of marijuana;

G. The minor [A.G.] has extremely poor attendance at [her high school];

H. The mother has been previously indicated by DCFS for: Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect on

April 1, 2022[,] and April 27, 2022;

I. The legal father to the minors [N.J. and R.J.], Dorrell [J.], has been previously indicated by DCFS for: Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect on April 27, 2022;

J. The mother has a criminal history that includes a conviction for Driving Under the Influence ***;

K. The legal father to the minors [N.J. and R.J.], Dorrell [J.], has a criminal history that includes a conviction for Armed Robbery *** and a pending charge for Battery."

The petition relating to N.J. alleged substantially the same.

¶ 6          In March 2024, FamilyCore filed a dispositional report with the court. The caseworker indicated Amelia G. had been cooperative with her and the agency since the case opened. Her goals included managing substance abuse and mental health, maintaining communications with the caseworker, providing a safe and stable environment for her children, and attending medical appointments. Later that month, the trial court entered an order indicating Amelia G. had stipulated to the allegations in the petitions, with the exception and agreement that the State dismissed the claim in count I(E)(4). The court found a factual basis existed for the stipulation and adjudicated the minors neglected on the grounds alleged in the petitions.

¶ 7          The same day, the court entered a dispositional order finding Amelia G. unfit based on the allegations in the petitions, "particularly domestic violence, substance abuse." The court ordered Amelia G. to complete a number of tasks to address the conditions leading to the adjudication of neglect, including the following: (1) obtain a drug and alcohol assessment arranged by DCFS or its designees and follow, cooperate with, and successfully complete any course of

- 4 -

treatment recommended; (2) provide proof to DCFS or its designee of the successful completion of the treatment; (3) perform random drug drops twice per month at the agency's discretion; (4) submit to a mental health assessment arranged by DCFS or its designees and follow the recommendations made; (5) participate and successfully complete a parenting course or parenting classes specified by DCFS or its designee and provide DCFS or its designee proof of the successful completion of such parenting course or classes; (6) obtain and maintain stable housing conducive to the safe and healthy rearing of her minor children; (7) visit her minor children as scheduled; and (8) use her best efforts to maintain a legal source of income.

¶ 8        In February 2025, the court entered a written order changing the permanency goal from "return home pending status for all minors" to "substitute care pending court decision for all minors."

¶ 9                                    B. Termination Petition

¶ 10        In July 2025, the State filed petitions to terminate Amelia G.'s and Dorrell J.'s parental rights with respect to R.J. and N.J. The petitions alleged Amelia G. was an unfit person under 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)). Specifically, the petitions alleged she failed to make reasonable progress toward the return of R.J. and N.J. to her care within nine months after the adjudication of neglect (October 18, 2024, to July 18, 2025). See *id.*

¶ 11        In October 2025, the trial court conducted a hearing on the petition to terminate Amelia G.'s parental rights. At the hearing, Amelia G. stipulated to the foundation and admissibility of the People's exhibit No. 1 (a certified copy of Amelia G.'s drug drop records), People's exhibit No. 2 (a certified copy of Amelia G.'s mental health and chemical dependency records from Trillium Place (Trillium)), People's exhibit No. 3 (a certified copy of Amelia G.'s

service plans from FamilyCore), and People's exhibit No. 4 (a certified copy of Amelia G.'s visitation records from FamilyCore). The court took judicial notice of the court files, including the prior pleadings and written orders, with no objections.

¶ 12 Child Welfare Specialist Stephanie Church, the caseworker, testified that from October 18, 2024, to July 18, 2025, Amelia G. was required to submit to a drug and alcohol assessment, a mental health assessment, drug drops twice a month, domestic violence classes, and individual counseling. During this time period, Amelia G. did not have stable housing, was unhoused on multiple occasions, failed to update Church when she changed addresses, did not have stable employment, failed to complete the recommended outpatient treatment, only completed 4 of her 19 drug drops, and had appeared under the influence of alcohol when interacting with the children on two occasions. Although Amelia G. completed her domestic violence class, she was still in a relationship with Dorrell J., who was arrested in May 2025 on domestic violence charges against her. Amelia G. failed to complete outpatient mental health treatment, and after completing a new assessment, she was unsuccessfully discharged. According to Church, Amelia G. was not equipped to provide the level of care N.J. required due to her serious medical conditions, had not been attending N.J.'s doctor's appointments on a consistent basis, and failed to adequately educate herself on N.J.'s conditions. Church testified R.J. has even more significant special needs, requiring a very high level of care. Specifically, R.J. is nonverbal and uses American Sign Language (ASL) to communicate; has tetralogy of Fallot; has several cardiac catheters; has a history of open heart surgery; requires oxygen; has physical, occupational, developmental, and feeding therapies; has optometric needs for a lazy eye and perception issues; has a cranial helmet and a left ankle brace; has a global developmental delay; requires a walker; and has 84 hours of in-home nursing care approval. In Church's opinion, Amelia G. had not

reached out to educate herself regarding these conditions and had not attended R.J.'s doctor's appointments.

¶ 13          In closing arguments, the State asserted Amelia G. failed to address the conditions leading to the adjudication of neglect and had not made reasonable progress toward the return of the children during the nine-month period alleged in the petition to terminate her parental rights. Specifically, Amelia G. lacked housing and employment stability, failed to address her substance use, remained in an unhealthy and violent relationship with Dorrell J., did not adequately cooperate with the agency, and was unable to meet the extensive medical needs of either child.

¶ 14          Amelia G.'s counsel argued that during the relevant nine-month period, Amelia G. was cooperative, executed releases of information, and had completed her drug and alcohol evaluation. Although her drug drops were initially inconsistent, they were consistently negative later in the nine-month period. Additionally, she completed her parenting and domestic violence classes. Although she had issues with housing stability, she had completed many hours of outpatient treatment. Counsel then listed in detail Amelia G.'s attendance and participation in outpatient treatment at Trillium and asked the court to pay special attention to the visitation records, which showed she attended at least 20 visits with the children without incident. Counsel claimed Amelia G. had not been invited to attend any of the children's doctor's visits. Finally, counsel asserted Amelia G. made reasonable progress and asked the court to find that the State had not proven its case by clear and convincing evidence.

¶ 15          The trial court found the State had proven the allegations in the petition by clear and convincing evidence. The court first acknowledged the records showed Amelia G. was an active participant in outpatient treatment at Trillium. However, Amelia G. was consistently rated as unsatisfactory in most categories of her service plans throughout the relevant nine-month period

set forth in the petition. As recently as the June 2025 substance abuse evaluation, Amelia G. admitted she continued to drink alcohol on a regular or periodic basis. Her substance abuse continued to negatively affect her life, specifically in the areas of domestic abuse, housing, and supervised visits with her children. Based on her lack of progress in these areas, the State had shown it was no closer to returning R.J. and N.J. to Amelia G.'s care at the end of the nine-month period alleged in the petition than at the beginning. Accordingly, the court found she was an unfit parent under section 1(D)(m)(ii) of the Adoption Act (*id.*).

¶ 16                                    C. Best-Interest Hearing

¶ 17         The trial court then conducted the best-interest portion of the hearing. First, the court admitted the best-interest report without objection. The report detailed Amelia G.'s service plan history and progress and recommended the permanency goal for both R.J. and N.J. be changed to adoption.

¶ 18         The State again called Church to testify. Church testified Amelia G.'s visits had not been reinstated since being suspended for a second time in August 2025. Although she had completed a drug drop, Church did not yet have the results. To Church's knowledge, she remained unhoused and unemployed. The trial court inquired of Church whether, if asked, she would testify consistently with the contents of her best-interest report, and Church responded she would.

¶ 19         The State then called the foster mother, Taylor C., to testify. According to Taylor C., R.J. and N.J. called her "mama," and called her husband "[d]addy." Taylor C. works as a nurse specializing in critical congenital heart conditions and became the foster mother to R.J. after taking care of her in the pediatric intensive care unit. Taylor C. described how she took care of R.J.'s medical needs on a daily basis in her home and opined that R.J. had improved since being in their home. She also described N.J's medical needs and her improvement since coming into their care.

Taylor C. testified R.J. and N.J. attended ASL classes every week with her and her husband, and her extended family was also making efforts to learn ASL. She had a lot of support for the children from family and friends, as well as from colleagues in the nursing profession. Taylor C. acknowledged her racial and cultural backgrounds differed from the children, which she addressed by embracing their differences, such as learning how to style the children's hair and seeking out African American health care providers. According to Taylor C., the children did not talk about their biological parents at home. Finally, Taylor C. expressed her commitment to providing permanency for both girls and her desire to adopt them.

¶ 20        Amelia G. did not testify at the termination hearing and presented no evidence.

¶ 21        In closing, State argued it was in the children's best interest to terminate Amelia G.'s parental rights based on all of the statutory best-interest factors, and the guardian *ad litem* (GAL) agreed. Specifically, the GAL indicated Amelia G. was not able to adequately and safely address the children's health and safety needs, while the current foster placement was eminently capable and willing to do so.

¶ 22        The trial court discussed each of the statutory best-interest factors and concluded it was in the minor children's best interest that Amelia G.'s parental rights be terminated. Specifically, the court found the physical health and safety factor weighed in favor of termination due to the children's very high level of special needs, which Amelia G. was not equipped to address due to her lack of housing stability. The foster parents were doing a "remarkable" job of addressing those needs, and the children were progressing well in their care. The children had a strong bond with their foster parents, and the children's need for permanency and stability at their young age additionally weighed in favor of termination.

¶ 23        These consolidated appeals followed.

¶ 24                                    II. ANALYSIS

¶ 25        On appeal, appellate counsel has filed a motion in these consolidated cases to withdraw as counsel, accompanied by a supporting memorandum in compliance with *Anders v. California*, 386 U.S. 738 (1967). Appellate counsel provided Amelia G. a copy of the motion and supporting memorandum. This court notified Amelia G. of her opportunity to file additional points and authorities on or before January 20, 2026, but she has not responded. We grant appellate counsel's motion to withdraw in both cases and affirm the trial court's judgments.

¶ 26                          A. Motion to Withdraw as Counsel

¶ 27        The procedure set forth in *Anders* applies to an appellate counsel's motion to withdraw as counsel following findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). Pursuant to *Anders*, appellate counsel must attach to the motion to withdraw a memorandum of law (1) outlining any issues in the record which might arguably support the appeal, (2) explaining why counsel finds those issues frivolous, and (3) concluding the case presents no viable grounds for appeal. *Id.* The reviewing court must then decide, after a full examination of all the proceedings, "whether the case is wholly frivolous." *Anders*, 386. U.S. at 744.

¶ 28                    B. Parental Unfitness and Termination of Rights

¶ 29        Section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2024)) establishes a two-step process for the involuntary termination of an individual's parental rights. First, the State must prove by clear and convincing evidence that a parent is "unfit." See 750 ILCS 50/1(D) (West 2024); *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). In this case, the State alleged Amelia G. was unfit in that she failed to make reasonable progress toward the return of the children to her care during the period of October 18, 2024, to July 18, 2025. See 750 ILCS

50/1(D)(m)(ii) (West 2024). "Reasonable progress" is determined by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent's failure to make reasonable progress toward the return of the children to her care "includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care" during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the court may soon be able to order the return of the child to the parent's custody. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. This court will not reverse a trial court's finding of unfitness unless it was against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 30        Once the trial court has found a parent unfit, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004). In considering the child's best interest, the court must consider the following factors in the context of the child's age and developmental needs:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> > (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such

love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

This court will not disturb the trial court's finding that termination is in the minor children's best interest unless it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 31    Appellate counsel claims any appeal in these consolidated cases would be frivolous because there are no viable issues to raise in this case. Although counsel was able to identify several issues, upon a review of the full record, she found none of them sufficient to overturn or

challenge the trial court's finding of unfitness based on Amelia G.'s lack of progress toward the return of the children in the nine-month period alleged in the petition. Specifically, counsel concluded that there were no irregularities or errors with respect to the fitness hearing, including any issue of ineffective assistance of counsel, and no meritorious argument can be made that Amelia G.'s conduct during the relevant nine-month period constituted reasonable progress. Although Amelia G. had completed a parenting class and an anger management course, her housing, transportation, and employment were not stable through the nine-month period.

¶ 32 Appellate counsel additionally found nothing in the record from which it could reasonably be argued the trial court's best-interest decision was against the manifest weight of the evidence. Counsel suggested one could argue it was not in R.J.'s or N.J.'s best interest to terminate Amelia G.'s parental rights based on her attendance and participation in outpatient rehab, regular visits, and bond with N.J. However, counsel ultimately concluded all the other evidence presented at the best-interest hearing appeared to support the court's findings, including Amelia G.'s failure to adequately address her substance abuse issues and appearing intoxicated at visits. Our review of the record and the applicable law leads us to conclude counsel is correct. Accordingly, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 33 III. CONCLUSION

¶ 34 For the reasons stated, we grant appellate counsel's motions to withdraw as counsel in these consolidated cases and affirm the trial court's judgment in both cases.

¶ 35 Affirmed.